# In the United States Court of Federal Claims

No. 24-1784
Filed: June 2, 2025[*]
FOR PUBLICATION

---

**TELESTO GROUP, LLC,**
                              *Plaintiff,*

**v.**

**UNITED STATES,**
                              *Defendant,*

                    **and**

**ACCENTURE FEDERAL SERVICES, LLC,**
                              *Defendant-Intervenor.*

---

*Hamish Hume*, Boies Schiller Flexner LLP, Washington, D.C., *Samuel C. Kaplan, Benjamin P. Solomon-Schwartz*, *Jessica G. Mugler*, *Corey P. Gray*, of counsel, for the plaintiff.

*Christopher A. Berridge*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Blaine L. Hutchinson*, U.S. Army Legal Services Agency, of counsel, for the defendant.

*Aron C. Beezley*, Bradley Arant Boult Cummings LLP, Washington, D.C., *Gabrielle A. Sprio*, of counsel, for the defendant-intervenor.

## MEMORANDUM OPINION

***HERTLING*, Judge**

  The plaintiff, Telesto Group, LLC ("Telesto"), filed this bid protest challenging the conduct by the defendant, acting through the United States Army ("Army"), of the prototype phase of the Enterprise Business System-Convergence ("EBS-C") program. The EBS-C program was initiated under the Army's "other transaction" authority ("OT authority"),

---

[*] Pursuant to the protective order in this case, this opinion was filed under seal on May 16, 2025, and the parties were directed to propose redactions of confidential or proprietary information by May 30, 2025. Counsel for Telesto proposed redactions, which are accepted and denoted by [* * *].

10 U.S.C. § 4022, to develop a solution to consolidate five Army business systems and improve their efficiency.

In establishing the project, the Army announced that at the conclusion of the prototyping stage the successful participant could receive a follow-on production contract. The prototyping stage of the EBS-C program would be conducted through a series of competitive steps. Phase 1 of the program consisted of a multistep series of prototyping tasks. The Army would conduct an evaluation of the participants after each step and determine which participants would be invited to advance to the next step.

The defendant-intervenor, Accenture Federal Services, LLC ("Accenture"), was the only participant in the prototyping process to be invited to continue to step 7, the final prototyping step, that could lead to a follow-on production contract for the solution developed in the prototyping phase of the project.

Telesto challenges the Army's evaluations of both steps 4 and 5 of the project, alleging they were arbitrary and capricious. Telesto alleges that although Accenture faked a key component of its technological demonstration at step 4, the Army failed to detect the fake outcome and allowed Accenture to proceed to step 5. Telesto also alleges that the Army changed the requirements for the key technological demonstrations at step 5, making it easier for Accenture to meet the new requirements. Both missteps, Telesto asserts, improperly affected the Army's decision to eliminate Telesto after step 6 and to invite only Accenture to proceed to step 7.

In addition to the Army's alleged arbitrary and capricious conduct of the evaluation process, Telesto alleges that the Army violated the statutory requirement that OT-authority projects include "at least one nontraditional defense contractor . . . participating to a significant extent in the prototype project." 10 U.S.C. § 4022(d)(1)(A).

In response, both the defendant and defendant-intervenor have moved to dismiss the protest. They argue that the Court of Federal Claims lacks jurisdiction to consider projects conducted pursuant to the Army's OT authority. In the alternative, they argue that Telesto failed to raise its claims in a timely manner, as they arose during the prototype process, and the claims are now waived. The defendant and defendant-intervenor have also moved for judgment on the administrative record, arguing that the Army did not act arbitrarily and capriciously in its conduct of the prototype phase of the EBS-C program, and that Accenture meets the OT-authority statute's requirement of significant participation by a nontraditional defense contractor.

The motions to dismiss are granted in part. The court lacks jurisdiction to consider Telesto's claims of arbitrary and capricious conduct in the prototype phase of the EBS-C program. Jurisdiction exists, however, to consider whether the Army violated 10 U.S.C. § 4022(d)(1)(A). On that issue, Telesto's protest is denied, as the Army did not violate that statute.

The jurisdiction of the Court of Federal Claims to resolve challenges to OT projects remains uncertain. Several judges of this court have found jurisdiction to exist, but the Federal

Circuit has not squarely resolved the issue. The defendants' motions for judgment on the administrative record are granted in part and denied in part. Even if jurisdiction exists, however, Telesto's protest fails on the merits, because the record reflects that the Army made no prejudicial errors in its evaluations of steps 4 and 5 of the prototyping portions of the EBS-C program and its decision at step 7 was rational. Accordingly, the protest is dismissed in part and denied in part.

## I.    FACTUAL BACKGROUND

In November 2022, the Army issued a Statement of Need and a Prototype Project Opportunity Notice ("PPON") for the development of a prototype solution for the EBS-C program. (AR Tab 176 at 846.) Prototypes developed according to the PPON would assist the Army with its efforts to consolidate into a single program five "enterprise resource planning" ("ERP") defense-business systems that cover financial management, asset and inventory management, supply chains, and master data. (*Id.* at 849.) In addition to consolidating these ERP systems, prototypes would include functionality to replace systems, including one managing ammunition inventory, outside the ERP systems. (*Id.* at 850.)

The Army issued the Statement of Need under its "OT authority" provided by 10 U.S.C. § 4022. That statute outlines the authority of the Department of Defense to carry out prototype projects using a wider pool of potential contractors than might otherwise be available under a traditional solicitation issued pursuant to the Federal Acquisition Regulation ("FAR"). To conduct a program under the OT authority, 10 U.S.C. § 4022(d)(1) requires that prototype projects meet at least one of the following conditions:

(A) There is at least one nontraditional defense contractor [("NDC")] or nonprofit research institution participating to a significant extent in the prototype project.

(B) All significant participants in the transaction other than the Federal Government are small businesses (including small businesses participating in a program described under section 9 of the Small Business Act (15 U.S.C. 638)) or nontraditional defense contractors.

(C) At least one third of the total cost of the prototype project is to be paid out of funds provided by sources other than the Federal Government.

(D) The senior procurement executive for the agency determines in writing that exceptional circumstances justify the use of a transaction that provides for innovative business arrangements or structures that would not be feasible or appropriate under a contract, or would provide an opportunity to expand the defense supply base in a manner that would not be practical or feasible under a contract.

3

In addition to describing the prototype project, the Statement of Need "provide[d] notice to industry that the Army intends to use the authority in 10 U.S.C. § 4022(f)" to obtain "Follow-On Production Contracts or Transactions at the conclusion of the competitive process defined in the [PPON]."  (AR Tab 176 at 848.)

The Statement of Need explained that the project would proceed in three phases.  (AR Tab 176 at 857-58.)  The first phase, "Solution Discovery and Prototyping," focused on prototype development.  (*Id.* at 857.)  It would "end with the selection of the best team(s) and technical solution(s) that meet the needs of the Army before moving to [p]hase 2."  (*Id.*)  Phase 2, "Prototyping for Initial Limited Deployment," would launch a trial production of the prototype, and a successful developer would demonstrate that its product "met the [Project Work Statement ("PWS")] success criteria" and was ready to proceed into full production.  (*Id.* at 857-58.)  Phase 3, "Continued Prototyping to Full Deployment," would continue to develop the prototype project "until all of the functional capabilities are moved into production."  (*Id.* at 858.)  The Statement of Need predicted that Phase 3 would conclude in 2032.  (*Id.*)

After a developer successfully moved through all three phases, the Army planned to "award a separate effort [as Contract or Transaction]" that would allow the prototype to move into full production.  (*Id.*)  This production effort would take place in parallel with [p]hase 3 until the prototype was fully deployed.  (*Id.*)

Embedded within the first two phases was a seven-step competitive process that would lead to the potential follow-on production contract.  Participants would be evaluated at each step, and the Army would determine whether to invite a participant to move on to the next step.  The seven steps comprised [p]hases 1 and 2.  The chart below lists each step, its position within the EBS-C program, and how a developer moved from a given step to the next.

| Step number | Phase position | Description | Move to next step |
|---|---|---|---|
| **1** | 1 | Army evaluates developers' white paper submissions and demonstrated experience. | Upward Invite #1 |
| **2** | 1 | Offerors conduct oral presentations and technology demonstration. Offerors submit a PWS response, schedule, and price estimates for phases 1, 2, 3, and production. | Upward Invite #2 |
| **3** | 1 | Army conducts exchange and negotiations with offerors to agree on a PWS, team, price, and terms and conditions. | All agreement awards move to step 4 |
| **4** | 1 | Offerors perform the tasks stated in their agreed-upon PWS and conduct a second technology demonstration. | Upward Invite #3 |
| **5** | 1 | Offerors continue to perform PWS tasks and conduct a third technology demonstration. | Offerors that meet the success metrics outlined in the PWS will receive Upward Invite #4 |

| 6 | 1 | Army conducts exchanges and negotiations that will result in the Army's selection of the best solution and team for step 7 and beyond. | Upward Invite #5 |
| 7 | 2 | Awardee conducts agile prototype development for initial, limited deployment. | |

(AR Tab 163 at 777.)

Steps 1, 2, and 3 of the prototyping competition unfolded smoothly. After evaluating participants' white papers at step 1, the Army invited Telesto, Accenture, and two other participants to proceed to step 2. (AR Tab 300 at 2923; Tab 301 at 2925; Tab 302 at 2927; Tab 303 at 2929.) After the Army reviewed these four participants' presentations, technology demonstrations, and PWS submissions at step 2, it invited Telesto, Accenture, and one other offeror to proceed to step 3. (AR Tab 346 at 4595; Tab 347 at 4596; Tab 348 at 4597.) At the completion of step 3's exchanges and negotiations, all three participants received "acceptable" ratings for the PWS and moved on to step 4. (AR Tab 350 at 4600; Tab 351 at 4604; Tab 352 at 4608.)

At step 4, one of the steps Telesto challenges in this protest, the PPON instructed participants to "demonstrate the EBS-C [p]rototype [p]erformance for all [p]hase 1 requirements . . . including the EBS-C Prototype Phase 1 Success Metrics." (AR Tab 163 at 821.) Participants would "develop and install the EBS-C Solution in the Army Enterprise Cloud Environment . . . to prove out a hardened infrastructure and the [continuous integration/continuous delivery] pipeline." (*Id.* at 779.) Participants would also submit PWS deliverables for evaluation as step 4 progressed. (*Id.*) To progress to step 5, a participant needed to achieve an "Interim Authority to Test." (*Id.*)

After step 4, only Telesto and Accenture received invitations to proceed to step 5. (AR Tab 409 at 6141; Tab 410 at 6142.) During its evaluation of step 4, the Army provided feedback to Telesto and Accenture on the performance of their prototypes. The Army evaluated the performance of PWS milestones, the achievement of an "Interim Authority to Test" milestone, the oral presentation, and the technology demonstration. (AR Tab 405 at 6082.) The Army found that both Accenture and Telesto "met" the PWS and "Interim Authority to Test" milestones. (AR Tab 405 at 6082; Tab 407 at 6121.) The participants' oral presentations and technology demonstrations would be graded using adjectival ratings of unacceptable, marginal, acceptable, good, or excellent. (AR Tab 405 at 6083.) Accenture received ratings of good for both its oral presentation and technology demonstration (*id.* at 6096); Telesto received a rating of good for its oral presentation and a rating of acceptable for its technology demonstration. (AR Tab 407 at 6137.) Both Telesto and Accenture received invitations to proceed to step 5 on March 4, 2024. (AR Tab 409 at 6141; Tab 410 at 6142.)

In its motion for judgment on the administrative record, Telesto alleges that Accenture "faked" portions of its step 4 demonstration "by (a) failing to provide real-time integration with

SAP, while (b) purporting to show it in misleading ways." (ECF 44 at 20.)[1] It alleges that after completion of the step 4 demonstrations, Telesto's vice president of SAP practice "received information from a former [Accenture-collaborator] employee that Accenture had faked the [s]tep 4 demo[nstration] by not integrating its [Accenture-collaborator] engagement layer with the SAP core."[2] (*Id.* at 21.) Telesto asserts that at some point in time it shared this allegation with the Army (*id.* at 41), but the record reflects neither Telesto's report nor any indication the Army took any action in response to that report.

Step 5 required participants to demonstrate the ability to meet all success metrics required in phase 1, allowing them to achieve an "Authority to Operate." (AR Tab 163 at 780.) Step 5 required a technology demonstration, that would take place on-site at each participant's facility. (*Id.*) The PPON noted that the technology demonstration would "focus on the [participant's] approach to incorporate Human Centered Design and how their Agile Development methodology supports throughput and velocity." (*Id.*) In addition, the Army would evaluate each participant's approach to data transition. A successful demonstration would demonstrate how the participant's system could "[h]armonize master data across the five SAP ERP system[s]" and "[r]ationalize the individual program master data into a converged master data management and governance capability." (*Id.*) Finally, participants would also submit in step 5 a proposed PWS and price for phase 2 of the EBS-C program. (*Id.*)

At the end of step 5, the Army evaluated Telesto's and Accenture's performances on five technical "sprint" tests.[3] Sprints 1 and 2 were rated either "met" or "not met," while sprints 3 through 5 received adjectival ratings ranging from "unacceptable" to "excellent." (AR Tab 455 at 7420, 7422.) Both Accenture and Telesto were rated as having met sprints 1 and 2. (AR Tab 455 at 7420-21; Tab 457 at 7450-51.) On sprints 3, 4, and 5, Accenture received ratings of acceptable, excellent, and acceptable, respectively. (AR Tab 455 at 7431.) Telesto received ratings of acceptable, acceptable, and good, respectively. (AR Tab 457 at 7461.) On August 28,

---

[1] These allegations in Telesto's brief are recited here only for narrative purposes. This opinion relies only on facts drawn from the administrative record to make factual findings.

[2] SAP is the producer of the software used by the Army across the five platforms the EBS-C program seeks to consolidate.

[3] In sprint 1, participants delivered a presentation recommending which ERP the Army should retire first. (AR Tab 455 at 7420.) In sprint 2, participants delivered a presentation "detailing how the [v]endor would migrate core functionalities of SAP . . . into an alternative solution(s)." (*Id.* at 7421.) Sprints 3 through 5 were technology demonstrations. In sprint 3, each participant had to demonstrate its human-centered design approach by "[s]howcas[ing] an intuitive interface developed in a collaborative and inclusive process." (*Id.* at 7425.) In sprint 4, the participants had to demonstrate their "agile methodology to support throughput and velocity." (AR Tab 163 at 780.) In sprint 5, the participants had to demonstrate their approaches to data transition. (*Id.*)

2024, both Telesto and Accenture received invitations to proceed to step 6. (AR Tab 455 at 7433; Tab 457 at 7463.)

Step 6 consisted of negotiations and exchanges between the Army and the remaining participants. (AR Tab 163 at 780.) After the exchanges concluded, the Army was to invite the one participant it found to have developed and offered the best EBS-C solution to move to step 7. (*Id.*) Step 7 marked the beginning of [p]hase 2 of the EBS-C program. In determining which participant would proceed to step 7, the Army considered the evaluation reports from sprints 3, 4, and 5 of step 5; the step 6 evaluations, which reviewed each participant's prototype PWS and production PWS; the updated price each participant submitted at step 6; and the terms and conditions each participant submitted for step 6. (AR Tab 486 at 8038.) In its comparison of Telesto's and Accenture's performances, the Army compiled the offerors' ratings in this chart:

| | -- Step 5 -- | | | | | -- Step 6 -- | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Technical Integration Provider (TIP)** | Sprint 1 Army ERP Retirement (Met/Not Met) | Sprint 2 Transactional Data Rehosting (Met/Not Met) | Sprint 3 Human Centered Design | Sprint 4 Data Use Cases 1 & 2 | Sprint 5 Data Use Case 3 | Prototype PWS | Production PWS |
| **Accenture** | Met | Met | Excellent | Acceptable | Acceptable | Acceptable | Acceptable |
| **Telesto** | Met | Met | Acceptable | Acceptable | Good | Acceptable | Acceptable |

(*Id.* at 8042.)

The Army noted that the participants' ratings were identical, other than Accenture's excellent performance on sprint 3 and Telesto's good performance on sprint 5. (*Id.* at 8043-44.) While the Army rated both Telesto and Accenture as acceptable in its evaluation at step 6, the Army concluded that "the impact of Accenture's excellent demonstration during [s]print 3 far exceed[ed] the benefits of Telesto's demonstration in [s]print 5." (*Id.* at 8044.) This difference, "and the fact that Accenture's price is [* * *]% lower . . . than Telesto's," resulted in the contracting officer awarding the lone invitation to proceed to step 7 to Accenture on September 26, 2024. (*Id.* at 8045.)

## II.    PROCEDURAL HISTORY

Telesto filed this protest on October 30, 2024 (ECF 1) and moved for judgment on the administrative record on December 31, 2024 (ECF 44). The defendants each moved to dismiss the protest and for judgment on the administrative record on February 7, 2025. (ECF 50; ECF 52.) On February 25, 2025, the plaintiff responded to the defendants' motions. (ECF 56.) The defendants replied to the response to their motions to dismiss and for judgment on the administrative record on March 14, 2025. (ECF 63; ECF 64.) Oral argument was held in Washington, DC on April 1, 2025. On April 8, 2025, the parties filed supplemental briefs on an issue raised during oral argument. (ECF 77; ECF 78; ECF 79.)

Alongside its briefs on the merits of the protest, the plaintiff filed two motions to supplement the administrative record, both of which the defendant and defendant-intervenor have opposed. On December 31, 2024, the plaintiff moved to supplement the administrative record with six documents: three declarations from Telesto officers, a declaration from an independent expert hired by Telesto, and two email exchanges between counsel for the plaintiff, defendant, and defendant-intervenor. (ECF 45.) In the same motion, the plaintiff moved to complete the record with email exchanges it had identified as missing from the record. The defendant and defendant-intervenor opposed the motion to supplement on February 7, 2025. (ECF 53; ECF 51.) The plaintiff replied to the opposition on February 25, 2025. (ECF 57.) That same day, it filed a second motion to supplement the record with a second declaration from the independent expert. (ECF 58.) The defendant and intervenor opposed the second motion to supplement on March 14, 2025 (ECF 63; ECF 64), and the plaintiff replied on March 18, 2025 (ECF 66). The motions to supplement and complete the record are addressed in a separate opinion issued concurrently with this opinion, and the contents of the documents proposed to be added will not be relied upon for any legal or factual determinations in this opinion.

## III.    JURISDICTION AND STANDING

The defendants dispute both the court's jurisdiction to consider a protest of an OT project and Telesto's standing to bring such a protest.

The Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Courts hearing bid protests have summarized this jurisdictional requirement as three-pronged: a plaintiff may challenge (1) a solicitation by a federal agency; (2) an award or proposed award of a contract; or (3) any alleged violation of statute or regulation in connection with a procurement or proposed procurement. *22nd Century Techs., Inc. v. United States*, 57 F.4th 993, 998 (Fed. Cir. 2023).

To have standing to bring a bid protest in this court, a plaintiff must be an "interested party." 28 U.S.C. § 1491(b)(1). This standard is "more stringent" than the standing requirement under Article III. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). To show standing under § 1491(b)(1), a plaintiff must allege facts which, if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).

An offeror can demonstrate a direct economic interest in two ways. In a post-award bid protest, the plaintiff's complaint must "show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). The "substantial chance" test also applies to pre-award protests when the agency has reviewed the bids but has not yet made an award. *Orion Tech. v. United States,* 704 F.3d 1344, 1348 (Fed. Cir. 2013).

8

In place of the "substantial chance" test, an offeror in a pre-award protest may establish a direct economic interest by demonstrating the solicitation or bidding process caused it to suffer a "non-trivial competitive injury." *Weeks Marine v. United States*, 575 F.3d at 1361-62. This exception applies when a "prospective bidder" challenges the solicitation's terms, "prior to actually submitting a bid." *Orion Tech.*, 704 F.3d at 1348.

## IV.    STANDARDS OF REVIEW

Both defendants have moved to dismiss the protest for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). Under RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). It is the plaintiff's burden to establish by a preponderance of the evidence that subject-matter jurisdiction exists. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When a plaintiff's asserted jurisdictional facts are challenged, only those factual allegations that the defendant does not controvert are accepted as true. *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings. *Id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)).

In addition, the defendant and defendant-intervenor argue that the plaintiff has waived many of its claims, and the protest should be dismissed pursuant to RCFC 12(b)(6). They argue that, by failing to bring its claims concerning the Army's conclusions about step 4 and step 5 at the time the Army made the alleged mistakes during the prototype phase, Telesto forfeited its claims under the waiver principle established by *Blue & Gold Fleet v. United States*, 492 F.3d 1308 (Fed. Cir. 2008). *See M.R. Pittman Group, LLC v. United States*, 68 F.4th 1275, 1280 (Fed. Cir. 2023) (*Blue and Gold Fleet* dismissal is under RCFC 12(b)(6)).

Dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle [the claimant] to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). A court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiff is entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

On a motion for judgment on the administrative record pursuant to RCFC 52.1, the court's review is limited to the administrative record, with findings of fact made as if the case was a trial on a paper record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-56 (Fed. Cir. 2005). The court must determine whether a party has met its burden of proof based solely on the evidence in the administrative record. *Id.* at 1355-56. Genuine issues of material fact will not foreclose judgment on the administrative record. *Id.; see also Palantir USG, Inc., v. United States,* 904 F.3d 980, 989 (Fed. Cir. 2018).

Bid protests require a two-step analysis. *Bannum*, 404 F.3d at 1351. First, the court must determine whether the government's conduct is "arbitrary and capricious" or "not in accordance with law" under 5 U.S.C. § 706. *Id.* (citing 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4)). To find that an agency acted arbitrarily and capriciously, a court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Weeks Marine,* 575 F.3d at 1358 (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)).

The arbitrary and capricious standard requires a court to give considerable deference to the agency in conducting the first step of the analysis. *See Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021). A reviewing court may not substitute its judgment for that of the agency; instead, a court evaluates the basis for the agency's decision to determine if it is reasonable, supported by the record before the agency, and consistent with the law. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In the second step, the court must "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. "[T]he second step is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021). In the context of a pre-award protest, to prevail on its claim, a "protestor must demonstrate 'a greater-than-insignificant chance' that correcting the agency's errors [in the procurement process] could lead to a different result for the protestor." *SH Synergy, LLC v. United States*, 165 Fed. Cl. 745, 758 (2023) (quoting *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019)).

## V.    DISCUSSION

The plaintiff challenges the Army's compliance with 10 U.S.C. § 4022(d)(1) and argues that the Army's evaluations of steps 4 and 5 was arbitrary and capricious. Telesto also challenges the Army's conclusion at step 7 that Accenture's prototype was the better of the two. The defendants argue that the court lacks jurisdiction over the protest and that Telesto waived its claims. Accenture also argues that the plaintiff lacks standing to bring its protest because it cannot establish prejudice. Both defendants defend the Army's evaluations of steps 4 and 5.

Before addressing these arguments, however, it must be determined whether this protest is subject to jurisdiction in the Court of Federal Claims; the defendants argue it is not.

A.     **Jurisdictional Defenses**

1.     **The Court's Bid Protest Jurisdiction over OTs**

The jurisdiction of the Court of Federal Claims over a protest of an OT-authority project has been the focus of a growing body of caselaw.[4]  Agencies of the Defense Department, including the Army, are increasingly turning to the OT authority afforded by law to take advantage of the increased flexibility afforded to OT projects, as compared to FAR-governed procurements.  *See* A. Victoria Christoff, *The Ball is in Their Court: How the Federal Circuit can Clarify Bid Protest Jurisdiction for Prototype OT Agreements*, 52 Pub. Contract L. J. 549, 550 (2023) ("Over the past five years, the government's spending for OT agreements has exploded, with obligations increasing from $1.7 billion in fiscal year 2016 to $16.5 billion in fiscal year 2020."); Annejanette Heckman Pickens & Daniel J. Alvarado, *Other Transaction Agreements: An Analysis of the* Oracle *Decision and Its Potential Impact on the Use of OTAs*, 54 The Procurement Lawyer 1, 19 (2018) ("As agencies have embraced [the flexibility afforded by OTAs], the use of OTAs has significantly increased over the past six years."); Surya Gablin Gunasekara, *Other Transaction Authority: NASA's Dynamic Acquisition Instrument for the Commercialization of Manned Spaceflight or Cold War Relic?* 40 Pub. Contract L. J. 893, 900 (2011) ("It is clear that OTA's use has expanded significantly since 1958 when NASA first began to use OTA.").

An analysis of the court's jurisdiction over protests involving an OT project must start with the text of 28 U.S.C. § 1491(b)(1), which provides the Court of Federal Claims with jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  This procurement-specific provision reflects that the Court of Federal Claims is the presumptive forum for disputes over the acquisition of goods and services by agencies of the federal government.

Accordingly, the threshold jurisdictional issue to resolve before reaching the merits of Telesto's protest is whether an OT project is "in connection with a procurement or proposed procurement" that falls within this court's Tucker Act jurisdiction, as amended by the Administrative Disputes Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-75 (1996) (codified at 28 U.S.C. § 1491(b)(1)).  Congress has not made this initial inquiry easy, because it has defined OT projects by what they are not, rather than by what they are: "transactions (other than contracts, cooperative agreements, and grants)."  10 U.S.C. § 4021(a).

---

[4] *See Space Exploration Tech. v. United States*, 144 Fed. Cl. 433 (2019); *Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777 (2021); *Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167 (2022); *Ind. Rough Terrain Center, LLC v. United States*, 172 Fed Cl 250 (2024); *Raytheon Co. v. United States*, 175 Fed. Cl. 281 (2025).

Although section 1491(b)(1) does not define "procurement," Congress has elsewhere defined that term to include "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."  41 U.S.C. § 111; *see also Distrib. Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (adopting 41 U.S.C. § 111's definition of "procurement" to analyze Tucker Act jurisdiction); *AgustaWestland North America, Inc. v. United States*, 880 F.3d 1236, 1330 (Fed. Cir. 2018) (same).[5]  While adopting this broad definition, the Federal Circuit has held that the Tucker Act more narrowly grants the Court of Federal Claims jurisdiction "'*exclusively*'" over "'procurement solicitations and contracts.'"  *Hymas v. United States*, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (emphasis in original) (quoting *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010).  Logically, then, a suit over something that is not a procurement solicitation or contract is not within the jurisdiction of the Court of Federal Claims.

The Federal Circuit provided some guidance on the reach of section 1491(b)(1)'s "connection" to a procurement.  In *Distributed Solutions*, the Federal Circuit considered whether a challenge to a request for information ("RFI") was in connection with a procurement or proposed procurement and, thus, fell within the jurisdiction of the Court of Federal Claims.  The RFI was "for market research purposes only" and would "not result in a contract award."  *Id.* at 1342.  After receiving responses to the RFI, the agency "determined that it had decided to pursue alternative courses of action," and delegated the tasks contemplated by the RFI to an existing contractor, who then conducted its own RFI.  *Id.* at 1342-43.  The Federal Circuit began its analysis with the statutory definition of "procurement" as provided in 41 U.S.C. § 403(2) (now section 111): a procurement "includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services."  *Id.* at 1345.

The Federal Circuit determined that the RFI was part of the agency's process for determining its needs and was therefore connected to the procurement initially intended to follow the RFI.  *Id.* at 1346.  In concluding that the RFI was connected to a proposed procurement, the Federal Circuit explained that "the statute explicitly contemplates the ability to protest . . . pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over proposed procurements."  *Id.* at 1346.  The decision to initiate a process that could potentially lead to a procurement is itself a procurement decision.

In the context of the EBS-C program, the Statement of Need and the PPON are the functional equivalents of the RFI at issue in *Distributed Solutions*.  The Army's decision to use its OT authority, as opposed to some other authority more clearly tied to a procurement authority, to initiate the prototype phase of the EBS-C program was itself a procurement decision.  Under the authority of *Distributed Solutions*, the court may review the terms of the Statement of Need and the PPON to ensure compliance with laws applicable to OT projects.

---

[5] These decisions cite the definition of "procurement" in 41 U.S.C. § 403(2), which was recodified in 2011 without change as 41 U.S.C. § 111.

Just because the court may review the terms of the PPON at the outset of the Army's decision to use its OT authority does not mean, however, that the court also has jurisdiction to review every detail of the Army's conduct of the OT. The issue presented by this protest is whether the inner workings of the EBS-C program challenged by Telesto themselves constitute or otherwise involve a procurement or proposed procurement.

The applicable statutory authority for OTs employed by components of the Defense Department comes from 10 U.S.C. §§ 4021 and 4022. Section 4021 introduces OT projects by conferring on the Defense Department the authority to "enter into transactions (other than contracts, cooperative agreements, and grants) under the authority of this subsection in carrying out basic, applied, and advanced research projects." 10 U.S.C. § 4021(a). OT-authority projects are thus defined in the negative: they are research and development or prototyping projects that are not contracts, cooperative agreements, or grants.

Section 4022 provides more detail. The Defense Department and its components may use OTs to "carry out prototype projects that are directly relevant to enhancing the mission effectiveness of personnel of the Department [ ] or improving platforms, systems, components, or materials proposed to be acquired or developed by the Department [ ]. . . ." 10 U.S.C. § 4022(a)(1). Importantly, 10 U.S.C. § 4022(f) also authorizes an agency to include in an OT project a follow-on production contract to allow the agency to acquire the successful prototype, provided that the prototype program used competitive processes.

Against this statutory backdrop, OT projects aimed at developing products for military use, like the EBS-C program, present a distinct jurisdictional challenge. Congress, as noted above, has defined OTs as something other than contracts. Section 1491(b)(1) applies to "contracts" or to "procurements." The Federal Circuit, construing the reach of section 1491(b)(1), has held that the court's bid-protest jurisdiction is limited to "procurement contracts." The issue, to be clear, is not whether OT projects are exempt from judicial review. The defendant acknowledges they are not, and that acknowledgement is no doubt correct. Congress has not expressly and clearly exempted OTs from judicial review. *See Am. Hosp. Ass'n. v. Becerra*, 596 U.S. 724, 733 (2022) (cleaned up) ("Judicial review of final agency action in an otherwise justiciable case is traditionally available unless a statute's language or structure precludes judicial review."); *Lindahl v. Off. Pers. Mgmt.*, 470 U.S. 768, 780 (1985) ("when Congress intends to bar judicial review altogether, it typically employs language [that is] unambiguous and comprehensive . . ."). The issue is whether judicial review is available in the Court of Federal Claims as a protest or in a district court under the Administrative Procedure Act.

The first two avenues for jurisdiction under section 1491(b)(1) allow challenges either to a solicitation or proposal for a proposed contract or to the award or proposed award of a contract. In the governing statute, Congress has defined OT projects as something other than "contracts." *See* 10 U.S.C. § 4021(a). Therefore, these first two jurisdictional bases for protests under section 1491(b)(1) are not applicable and cannot support jurisdiction over a protest of an OT project. Accordingly, no party suggests that these jurisdictional bases confer or defeat jurisdiction over Telesto's protest.

Instead, the parties argue over jurisdiction under the third avenue under section 1491(b)(1): "any alleged violation of statute or regulation in connection with a procurement or proposed procurement." This jurisdictional hook itself has two parts. First, a party must allege a violation of statute or regulation. Second, a party must allege that the violation of statute or regulation on which the claim is premised is in connection with a procurement or proposed procurement. These two parts are logically considered in reverse order. The first step is to determine whether the claim involves a "procurement." Only after identifying the existence of a "procurement" can the court assess the claim to determine whether the plaintiff has alleged the plausible existence of a violation of statute or regulation.

The Army argues that this case must be dismissed as outside this court's bid protest jurisdiction under the authority of *Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016). (ECF 78 at 2-8.) In *Hymas*, the Federal Circuit addressed the issue of whether protests challenging cooperative agreements were within the protest jurisdiction of the Court of Federal Claims. The Federal Circuit held that cooperative agreements are not procurements and are therefore not subject to the Court of Federal Claims' bid-protest jurisdiction. 810 F.3d at 1328. Although the Federal Circuit has not yet addressed the jurisdiction of the Court of Federal Claims to hear protests over OT-authority projects under section 1491(b)(1), the Army argues that the reasoning of *Hymas* controls the jurisdictional issue presented here and requires dismissal.

Cooperative agreements and OT-authority projects have been closely linked by statute. In 1990, the Defense Department acquired the authority to "enter into cooperative agreements and other transactions" for research projects. National Defense Authorization Act for Fiscal Years 1990 and 1991, Pub. L. No. 101-189, 103 Stat. 1352 § 251(a)(1) (1989). This authority grew in 1994 to include prototype projects in addition to research projects. National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, div. A, tit. VIII, § 845 (Nov. 30, 1993). These authorities jointly shared shifting statutory placement until 2016, when the authorization for OTs was split from the authority to enter into cooperative agreements and began to take its current statutory form. National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92 § 815(a)(1), 129 Stat. 726 (2015). In 2021, the OT authority arrived in its current statutory home, 10 U.S.C. §§ 4021 and 4022.

Given the historical relationship between cooperative agreements and OT-authority projects at the Defense Department, a close examination of *Hymas* informs the jurisdictional analysis over Telesto's protest. The plaintiff in *Hymas* was a farmer who protested the Fish and Wildlife Service's decision not to award him a cooperative farming agreement ("CFA"). The CFA would have permitted the plaintiff to "farm specific parcels of public land with specific crops that benefit wildlife." *Hymas*, 810 F.3d at 1315. Importantly, "no payment occurs for the performance of the CFAS." *Id.* Instead, participating farmers typically kept 75 percent of their crop yield, while the remaining 25 percent was used by the Fish and Wildlife Service to feed resident wildlife. Throughout the life of the CFA, the Fish and Wildlife Service had advised farmers under a CFA on decisions involving crop selection and farming methods. *Id.*

On appeal from this court's decision finding the protest fell within the jurisdiction provided by section 1491(b), the Federal Circuit held that the Court of Federal Claims had lacked jurisdiction to hear the plaintiff's protest of the decision not to award the plaintiff a CFA. *Id.* at

1324. The Circuit's decision turned on "whether [the Fish and Wildlife Service] properly construed the CFAs as cooperative agreements rather than procurement contracts." *Id.* at 1318. To make that determination, the Circuit analyzed "the principal purpose of the relationship" between the government agency and the program participant. *Id.* at 1327.

The Federal Circuit focused on the distinction between a cooperative agreement and a procurement. Under a cooperative agreement, an agency "transfer[s] at thing of value to the private farmers to carry out a public purpose of support or stimulation." *Id.* A procurement occurs when an agency "acquir[es] . . . property or services for the direct benefit of or use of the United States Government." *Id.* Under the facts before it, the Federal Circuit determined that the CFA was a cooperative agreement. Because bid-protest jurisdiction under section 1491(b) "speaks *exclusively* to procurement solicitations and contracts," this court should not have heard the protest. *Id.* at 1324 (emphasis in original) (cleaned up).

The import of *Hymas* is clear: the Court of Federal Claims may not exercise jurisdiction over any complaint that does not concern a procurement. The court's jurisdiction to hear Telesto's protest then turns on whether the EBS-C program or any portion thereof, created and managed pursuant to the Army's OT authority, is a procurement. The resolution of that question must begin, as it did in *Hymas*, with a determination of the "principal purpose of the relationship" between prototype program participants and the Army. *See Hymas*, 810 F.3d at 1327.

This "principal purpose" inquiry has been followed and applied in a recent series of decisions by judges of this court in protests challenging OT projects. In *Raytheon v. United States*, Judge Bonilla explained that assessing jurisdiction to hear a protest from an OT project "requires an evaluation of the federal agency's *immediate* endgame." 175 Fed. Cl. 281, 293 (2025) (emphasis added). In *Independent Rough Terrain Center v. United States*, Judge Davis explained that to assess whether jurisdiction over an OT protest exists, the "relevant inquiry requires the [c]ourt to look at what the [g]overnment is seeking" to obtain, *i.e.*, a product or service. 172 Fed. Cl. 250, 258 (2024).

Consistent with the governing test announced by the Federal Circuit in *Hymas* and distilled further in these recent precedents in this court, the resolution of the motion to dismiss for lack of jurisdiction requires an analysis of the EBS-C program's "principal purpose." Although OTs and cooperative agreements have a common statutory origin, that common history does not control the outcome to the jurisdictional question. Since the two non-contract formats were established, the laws governing OTs have evolved to reflect their distinctive purpose as a more "flexible method to facilitate research, development, and prototyping than traditional procurement contracts." *Indep. Rough Terrain*, 172 Fed. Cl. at 257 (citing S. Rep. No. 106-292, § 807, at 324, 114 Stat. 1030 (2000)). The enhancement of the OT authority granted to the Defense Department and its components has allowed the covered agencies to expand their reliance on OT projects, but with that expansion, it has separated OTs from their statutory placement alongside cooperative agreements. Section 4021 of title 10 now distinguishes

15

cooperative agreements from OTs.[6]  Under the current statutory framework, the conclusion of *Hymas* that cooperative agreements are not subject to jurisdiction under section 1491(b)(1) is not dispositive of the jurisdictional question for OTs.  Rather, the "principal purpose" test of *Hymas* establishes the controlling criterion.

The principal purpose of the EBS-C program is very different from the principal purpose of the cooperative agreement that the Federal Circuit found in *Hymas* to be beyond the scope of section 1491(b)(1)'s protest jurisdiction.  Through the EBS-C program, the Army seeks a solution to a specific, technical need: "a software initiative to provide a modernized warfighting capability that enables integrated and auditable sustainment operations from the strategic support area to the tactical edge of the battlefield."  (AR Tab 163 at 772.)  The product resulting from the prototype project will "converge five Army enterprise level [Defense Business Systems] into an integrated finance-logistics transactional core."  (AR Tab 176 at 848.)  The Army's current set of disparate systems, the Statement of Need explains, "create[s] integration inefficiencies, produce[s] dissimilar and cumbersome user experiences, and cannot support a common master data governance approach."  (*Id.*)

The Statement of Need further dictates how the solution the Army desires will be structured.  Solutions should be "based, at the transactional core level, on the capabilities of the SAP S/4HANA, a modernized cloud-based software.  The EBS-C [s]olution will demonstrate and then employ a User Engagement Layer (on top of SAP S/4HANA) . . . ."  (*Id.*)  The Army has an identified need.  The "principal purpose" of the EBS-C project is to develop a solution to address that need in a manner consistent with the Statement of Need and PPON.  After a participant has successfully developed a prototype meeting the Army's requirements, the Army intends to acquire it.

Examining an OT's principal purpose determines whether the OT can effectively itself be or include a proposed procurement.  For example, an OT project that simply seeks the development of a prototype and does not contemplate the acquisition of the successful prototype is not a procurement,[7] and any challenge to such an OT is outside the coverage of section 1491(b)(1).  In contrast, an OT that, from the outset, anticipates that the agency will acquire the successful prototype to meet its particularized needs could go two ways: the agency could proceed with the prototype process, determine that at least one participant developed a successful

---

[6] Section 4021(d)(1) of title 10 specifically distinguishes between "[a] cooperative agreement . . . and a transaction authorized by subsection (a)," which is an OT.

[7] As an example, the prototype project in *SpaceX* focused on "the development of prototypes for launch systems" to create a pool of launch systems available for both commercial and government use.  *SpaceX*, 144 Fed. Cl. at 437.  The program took the form of a competition in which awardees would receive funding from the Air Force to conduct further prototype development.  *Id.*  At the end of the prototyping phase, the Air Force would hold a separate, FAR-governed competition, open to all interested offerors, for two requirements contracts for space-launch services.  *Id.* at 437-38.

prototype, and proceed with the contemplated follow-on contract; alternatively, the agency could proceed with the prototype process, determine that no participant has developed a successful prototype, and elect not to award a follow-on contract.  In the first scenario, which aligns with the EBS-C program's trajectory, the OT project becomes a proposed procurement when the Army determines that it will award a follow-on contract.  Any review of the agency's compliance or failure to comply with the governing statutes and applicable regulations would therefore be "in connection with" that proposed procurement and subject to the court's jurisdiction.  *See Distrib. Sols.*, 539 F.3d at 1346 (cleaned up) (to establish that an agency action is "in connection with a procurement or proposed procurement, . . . the contractors must demonstrate that the government at least initiated a procurement, or initiated the process for determining a need for acquisition").

The evidence of an agency's determination to proceed or not to proceed to the follow-on contract will differ from case to case, but the boundary between "procurement" and "not a procurement" aligns with that determination.  *See Raytheon*, 175 Fed. Cl. at 294.  The flexibility afforded to agencies by this framework is consistent with the underlying legislative purpose in authorizing agencies to use OTs; the Defense Department conducts OT projects to facilitate the development of new technologies that are uncertain to be successful.  Any specific project's status as a procurement will be determined by the progress made during prototyping, and the agency need not commit to procuring any product or service developed through the OT until it determines that the prototype can successfully meet its needs.

In anticipation of the scenario in which an agency includes a prospective acquisition of the successful prototype from the outset of the OT, Congress has required an agency in such a case to use competitive procedures at some point in the process.  10 U.S.C. § 4022(f)(2).  The obligation to use competitive procedures reflects a limitation on agency authority; in the absence of clear statutory language to the contrary, such a limitation is typically subject to judicial oversight.  This obligation bears the hallmark of a procurement.  To find otherwise would be overly formalistic.  An OT that contemplates a follow-on production contract under 10 U.S.C. § 4022(f), takes on the characteristics of a procurement as that term is reflected in 41 U.S.C. § 111 and common usage.[8]  Such an OT should, at some point in the process, be treated as a

---

[8] Admittedly, 41 U.S.C. § 111 is not strictly applicable to Title 10 of the U.S. Code, *see* Joshua Fix, *Saving Other Transaction Agreements from Bid Protest Review: How to Keep OTs as Innovative and Flexible Tools for Research and Development*, 53 Pub. Contract L. J. 737, 773 (2024), but its definition of "procurement" applies to define the court's jurisdiction under 28 U.S.C. § 1491(b)(1).  *Distrib. Sols., Inc.*, 539 F.3d at 1345.  Without an applicable definition of "procurement" within Title 10, courts must fall back on common usage.  *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.")  The definition in Title 41 focusing on the acquisition of a product or service reflects common usage.  *Procurement*, Merriam-Webster, https://www.merriam-webster.com/dictionary/procurement (accessed Apr. 28, 2025) (emphasis in original) ("the act or process of procuring *especially*: the obtaining of military supplies by a

procurement for purposes of determining which judicial forum has jurisdiction.  If there is a procurement, then this court may exercise jurisdiction under section 1491(b)(1).  If the OT lacks a procurement, jurisdiction lies with a district court under the APA.

For purposes of this court's jurisdiction in this case, the EBS-C program became one "in connection with a . . . proposed procurement" once the Army completed the prototyping process and determined both that the process was successful and that it would acquire the successful prototype through a follow-on production contract.  When those elements are met, the OT became a proposed procurement subject to being protested in this court under section 1491(b)(1). This conclusion departs modestly from the holdings in *Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 192 (2022), and *Raytheon,* 175 Fed. Cl. at 295.  It is not enough that the agency contemplates a follow-on procurement at the outset of an OT for the project to be a proposed procurement subject to this court's jurisdiction.  Rather, that stage is reached only when the prototype process is completed successfully, and the agency decides to move forward to procure the prototype.  Thus, an OT may be challenged at the outset for compliance with the OT statutes (including the Procurement Integrity Act) and regulations and other generally applicable laws.  Challenges to an agency's conduct of an OT commenced pursuant to an agency's authority under 10 U.S.C. § 4022(f), however, do not fall within the protest jurisdiction of the Court of Federal Claims until the prototyping phase is concluded, and the agency decides to proceed with a proposed procurement.  During the performance of the prototyping phase of an OT, there is an effective jurisdictional blackout.

Determining that the EBS-C program is a "procurement" within the ambit of section 1491(b)(1) does not necessarily support the exercise of jurisdiction to the same extent as a protest involving a routine procurement typically governed by the FAR, the Defense Federal Acquisition Regulation Supplement ("DFARS"), and generally applicable procurement laws. The definition of an OT as not being a contract and the exemption of OTs from most procurement laws so they can serve as nimble and flexible tools for innovation give pause to any inclination to bring to bear the full scope of judicial review over a protest of an OT.

As noted, section 1491(b)(1) confers on the court jurisdiction over protests "to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  There is no solicitation for the EBS-C program.  The Statement of Need and the PPON establish the Army's need for the product or solution it is seeking to develop and establish the ground rules of the prototyping process, but they do not request proposals or other offers as a solicitation would.  Instead, they invite parties to participate in a multi-year process of research and development aiming to develop a product or service that the Army may, if the process is successful, eventually seek to acquire.

---

government); *Procure*, Merriam-Webster, https://www.merriam-webster.com/dictionary/procure (accessed Apr. 28, 2025) ("to obtain (something) by particular care and effort").

Likewise, there is no award or proposed award of a "contract" in the EBS-C program. This OT is not itself a procurement or proposed procurement, although it contemplated the award of a separate follow-on production contract if the prototype process produced a successful outcome. The Statement of Need gave notice that the Army intended at the outset to award a follow-on production contract pursuant to 10 U.S.C. § 4022(f) if the project succeeded, but no such contract has yet been awarded. Accenture's "award" of reaching step 7 of the phase 1 prototype project is not the award of a contract but reflects only the Army's decision to allow Accenture to continue to participate in the prototype project as the sole remaining participant. Telesto itself received several such "awards" when it progressed to the various steps prior to step 7. As Judge Davis observed in *Independent Rough Terrain*, a "follow-on production contract is materially distinguishable from . . . the OT prototype phase."[9]   172 Fed. Cl. at 258.

Telesto bears the burden to show that a contract has been awarded, and it has not advanced any argument that the Accenture's invitation to proceed to step 7 is a contract. True, the PPON suggests that Accenture's step 7 invitation *in combination with* its continued successful prototype performance may lead to a follow-on production contract. The Army's decision to allow Accenture to continue to work toward the award of an eventual production contract that may exist in the future is far from "the proposed award or the award of a contact" provided in section 1491(b)(1)'s grant of jurisdiction.

Without a solicitation or a contract award, the only jurisdictional possibility remaining in section 1491(b)(1) is the authority to review an agency's "alleged violation of statute or regulation in connection with a procurement or a proposed procurement." As discussed above, in the absence of any directly applicable statutory definition of "procurement," reliance must be had on the common understanding of that term. The commonly understood meaning of the term is synonymous with an "acquisition." That understanding is consistent with 41 U.S.C. § 111 and with the FAR. There is no indication that Congress employed "procurement" as a term of art subject to some other definition. Under the commonly understood meaning of the term, therefore, the decision to acquire a successful prototype at the conclusion of an OT conducted pursuant to 10 U.S.C. § 4022(f) is a "procurement."

Under this line of reasoning, the EBS-C program has become a procurement or, at least, a proposed procurement. This conclusion is consistent with the decision in *Wesleyan Co. v. Harvey*, 454 F.3d 1375, 1378-79 (Fed. Cir. 2006). In that case under the Contract Disputes Act, the Federal Circuit found that a purchase order for a prototype was a procurement contract, and, with one exception not relevant here, the Contract Disputes Act applies only to procurement contracts. 41 U.S.C. 7102(a). The conclusion is also supported by the Defense Department's own Other Transactions Guide ("OT Guide"), prepared by the Under Secretary of Defense for Acquisition and Sustainment. The OT Guide acknowledges that if the government awards a FAR-based production contract at the conclusion of the prototyping phase of an OT in

---

[9] Judge Davis's discussion concerned the difference between a solicitation issued during the prototype phase and a solicitation issued during the follow-on contract phase, but her distinction remains instructive outside that context.

accordance with 10 U.S.C. § 4022(f), that production contract is subject to the Contract Disputes Act. Office of the Undersecretary of Defense for Acquisition and Sustainment, Other Transactions Guide (hereinafter "DoD OT Guide") 22 n. 1 (version 1.0 2018). On this basis, and consistent with the third jurisdictional prong of 28 U.S.C. § 1491(b)(1), the Court of Federal Claims may review an OT project that has reached the end of the prototyping phase for any violation of statute or regulation that the plaintiff has alleged, but there is no authority to review an agency's conduct of the prototyping phase or the agency's evaluations of the participants' performance at various stages of that phase. Such a conclusion may seem odd, especially when Congress has required agencies to conduct a competitive process if they are to take advantage of the authority conferred by 10 U.S.C. § 4022(f), but it is the conclusion that makes the most sense from the admittedly opaque approach Congress has taken in authorizing agencies to use their OT authority.

The Army issued the EBS-C program pursuant to its OT authority, and the PPON explicitly provides that the program is "not subject to the federal laws and regulations governing traditional [FAR]-based procurement contracts." (AR Tab 163 at 775.) The FAR does not apply, and OTs are generally exempt from the provisions of the DFARS. DFARS 206.001-70 (exempting "follow-on production contracts for products developed pursuant to the 'other transactions' authority of 10 U.S.C. § 4022 from DFARS section 206's "Competition Requirements" regulation). The only applicable regulations are the Defense Department's own OT regulations at 32 C.F.R. Part 3, and Telesto has not alleged a violation of those regulations. As a result, allegations that the Army acted arbitrarily and capriciously in its conduct of the various prototyping phases of the project are beyond the court's jurisdiction because they do not present a claim involving a violation of statute or regulation.

Telesto may maintain within the court's jurisdiction under section 1491(b)(1) challenges to the Army's compliance with applicable statutes. Applying the standard of review established in 5 U.S.C. § 706(2), made applicable to bid protests through 28 U.S.C. § 1491(b)(4), to this framework, a court may determine whether an agency's actions are "not in accordance with law," 5 U.S.C. § 706(2)(B), contrary to constitutional right," *id.* § (2)(C), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.*, or "without observance of procedure required by law," *id.* at §(2)(D). Review for agency action that may be "arbitrary, capricious, [or] an abuse of discretion" or that is "unsupported by substantial evidence," *id.* at § (2)(A) & (E), is not available unless a statute or regulation applicable to OTs otherwise establishes these standards.

The statutes applicable to this OT include not only 10 U.S.C. §§ 4021 and 4022, but also the Defense Department's regulations governing OTs (32 C.F.R. Part 3) and statutes otherwise applicable, such as the Procurement Integrity Act (41 U.S.C. § 2101 *et seq.*), which Congress made applicable to OTs through section 823 of the Fiscal Year 2006 National Defense Authorization Act, Pub. L. No. 109-163, 119 Stat. 3387. This jurisdiction extends to the Army's decision to use an OT as its procurement vehicle and to the Army's compliance with these

statutes during the OT.[10]  *See Distrib. Sols.*, 539 F.3d at 1346 ("A proposed procurement, like a procurement, begins with process of determining a need for property or services.").  Procurement statutes specific to FAR-governed procurements, like the Competition in Contracting Act, 41 U.S.C. § 253, do not apply to OTs.  Competitive procedures are required, however, by section 4022(f), which provides that an agency may award follow-on production contracts "without the use of competitive procedures" only if competitive procedures are used during the prototype phase of an OT.  10 U.S.C. § 4022(f)(2).  The Statement of Need and the PPON establish the competitive framework for the OT, and those documents must reflect compliance with the applicable statutes and regulations.  Accordingly, Telesto may also maintain a challenge to the Army's compliance with the terms of the PPON and other program-related documents, because these documents are integral to the statutory and regulatory integrity of the OT.

Admittedly, there is at present no edfinitive answer to the jurisdictional puzzle presented by protests of OTs.  The goal is to align the statutory language governing and the congressional purpose underlying OTs with existing judicial precedents, arising mostly from protests of FAR procurements.  Perhaps the court has complicated the jurisdictional issue beyond what is necessary or appropriate.  Congress could help untangle the web by providing more guidance, but in its absence, agencies, prospective contractors, counsel, and judges of this court will need to await guidance from the Federal Circuit.  Ultimately, the court's conclusion on the jurisdictional issue is not dispositive of the plaintiff's claims.  All the claims will be addressed on the merits, and all of them fail.

Telesto has brought two challenges that fall within this jurisdictional scope: that the Army violated 10 U.S.C. § 4022(d)(1)(A) by not ensuring substantial participation by nontraditional defense contractors ("NDCs"), and that it violated the PPON by making changes, that advantaged Accenture, to the step-5 requirements and evaluation criteria.  These claims are jurisdictionally sound.

### 2.    Accenture's Jurisdictional Defenses

#### a.    Contract Administration

Beyond the issue of whether jurisdiction under section 1491(b)(1) exists, Accenture argues (ECF 50 at 10) that the court may not exercise jurisdiction over this protest because Telesto is challenging the Army's refusal to renew a task order, as each step of the prototyping process was conducted pursuant to a task order.  The decision by an agency not to renew a task

---

[10] For example, the EBS-C program might have been challenged successfully at the outset, because 32 C.F.R. § 3.1 limits the use of OTs to "prototype projects that are *directly relevant to weapons or weapon systems* proposed to be acquired or developed by the Department of Defense."  (Emphasis added.)  Based on this provision, it does not appear that the EBS-C program reflects a valid use of the Army's OT authority, because the project is not connected to the development of a weapon or weapon system.  Telesto did not challenge the validity of the EBS-C program on this basis, however, so no further consideration of this regulation is required.

order is a matter of contract administration outside the court's bid-protest jurisdiction.  *Coast Prof'l, Inc. v. United States*, 828 F.3d 1349, 1355 (Fed. Cir. 2016) ("If a contractor wishes to contest an agency's decision regarding exercising an option under the contract, such a challenge is a matter of contract administration governed by the [Contract Disputes Act]."). Further, Accenture argues that Telesto cannot establish standing or prejudice because its proposed price exceeded the total funding available to the EBS-C program and eventual procurement, and, as a result, Telesto was ineligible for award.  (ECF 50 at 17.)  Neither of these arguments precludes the exercise of jurisdiction over the protest.

Accenture argues that the "award" to Accenture that Telesto protests is actually "the exercise of an option under an existing prototype OT [agreement]."  (*Id.* at 5.)  It explains that after step 3, the Army awarded prototype agreements to three participants (Accenture, Telesto, and a third participant) to enable them to continue competing in the competition.  That award consisted of a base period permitting participation in step 4 and three option periods that corresponded with steps 5, 6, and 7.  Under this structure, Accenture argues, Telesto is protesting the Army's failure to exercise the third option period in Telesto's agreement.

Accenture's characterization, however, assumes that a "contract" was awarded at step 3 in the first place.  Both the OT statute (10 U.S.C. § 4021(a)) and the PPON make clear that no contract exists.  First, it must be assumed that no contract exists because the very definition of an OT project is a "transaction[ ] (other than contract[ ], cooperative agreement[ ], and grant[ ])." 10 U.S.C. § 4021(a).  If the Army awarded a contract during the prototyping phase of the project, it would be acting in conflict with the statute.  The structure of the PPON corroborates this understanding.  The invitations for participants to proceed to step 4 are termed "prototype agreement awards."  The administrative record reflects that step-3 participants received feedback on their step-3 performance (*see* AR Tab 350 at 4600, Tab 352 at 4608), but the administrative record contains no contract or other document reflecting the base-and-option-period structure that Accenture describes.  Steps 4 through 7 simply follow the structure established by the PPON at the outset of the prototype program: participants that perform satisfactorily at each step are invited to proceed to the next step; nothing in the structure of the program suggests that previously uncontracted participation is converted into a contracted endeavor after step 3. Without the existence of a contract, Telesto's protest cannot be a matter of "contract administration" that would normally fall outside the court's protest jurisdiction.

### b.    Standing

Accenture argues that because Telesto's proposed price was too high, Telesto cannot establish that it suffered any prejudice and cannot show it has standing.  In support of its argument, Accenture relies on *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 91 (2021) (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999)), in which the plaintiff was found to lack standing when the difference between the proposed price and the funds available to the agency "was too substantial for [the protester] to establish that it would have had a substantial chance of award . . . ."

Here, however, the record reflects that the Army showed flexibility on price.  The record shows that the Army knew about Telesto's proposed price since at least step 3, when participants submitted a payment milestone schedule.  (*See* AR Tab 378 (spreadsheet of Telesto's proposed

schedule for payment).)  Even after becoming aware of Telesto's proposed price, the Army continued to allow Telesto to advance through the prototyping phase of the project.  Between the beginning of the project and step 4, the Army disqualified three of the initial six participants in the OT; it had opportunities prior to the final decision to disqualify Telesto if its price was so high as to make it ineligible to compete for the step-7 invitation, and it did not avail itself of those opportunities.

The Army's final decision document reflects that, although Telesto's price was a factor in the decision to invite Accenture to proceed to step 7, it was just one of several considerations; the Army did not consider Telesto's price automatically disqualifying, as Accenture suggests.  (*See* AR Tab 486 at 8043-45 ("Based on the evaluations at [s]teps 5 and 6, and the fact that Accenture's price is [* * *]% lower . . . than Telesto's, Accenture's solution represents the best value to the [g]overnment.").)  Rather than simply conclude that Telesto's price was too high and proceed with award to Accenture, the Army compared Telesto's and Accenture's performances on each of the decision factors listed in the PPON: step 5, step 6, total evaluated price, and terms and conditions.  (*Id.*)

The Army's evaluation of the solutions offered by Telesto and Accenture at step 7 distinguishes this case from *Blue Origin*.  In that case, the offeror's proposed price was more than triple the agency's budget for the project, and the source-selection authority ("SSA") specifically noted that the funding was inadequate to support the agency's preferred approach of making two awards.  The SSA rejected the protester's offer "'in light of the Agency's currently available and anticipated future funding.'"  157 Fed. Cl. at 86 (quoting the administrative record).  Here, while Telesto's proposed price was higher than the funding available to the Army, the decision to proceed with Accenture's prototype is based on a comprehensive analysis of the relative merits of the two prototypes, and the price is but one aspect of the Army's comparative evaluation rather than a decisive aspect of the decision.

On this record, Telesto has demonstrated it is an interested party that could have obtained the award if not for the errors alleged, and for purposes of determining standing, Telesto's allegations must be assumed to be true.  *Am. Relocations Connections, LLC v. United States*, 789 F. App'x 221 (Fed. Cir. 2019).

## B.    Claims Over Which Jurisdiction Exists

Section 4022 provides that the Army may conduct projects under its OT authority if it meets one of a list of requirements.  *See* 10 U.S.C. § 4022(d)(1)(A)-(D).  For the EBS-C program, the Army tied its ability to use an OT to section 4022(d)(1)(A) ("the NDC statute"), which allows a Defense Department component to use an OT when "[t]here is at least one nontraditional defense contractor or nonprofit research institution participating to a significant extent in the prototype project."  This statute forms the basis for this OT, and the defendant conceded at oral argument that judicial review of the Army's compliance with the statute to support the use of the OT was within this court's jurisdiction.

Telesto's challenge to the Army's handling of step 5 also falls within the court's jurisdiction because Telesto alleges that the Army violated its obligations under the PPON.  A violation of the specific terms laid out by the PPON at the outset of the OT has the potential to

undermine the lawful basis for an OT.  As a result, jurisdiction in this court to review an agency's continued compliance with the terms of the PPON, or similar document establishing the ground rules for an OT, is a necessary corollary to the jurisdiction to ensure the initial compliance of an OT with applicable statutes and regulations.

### 1.    The Army's Compliance with 10 U.S.C. § 4022(d)(1)(A)

Telesto argues that the Army's award of the step-7 invitation to Accenture violates the NDC statute because "approximately [* * *]% of all labor projected by Accenture is being performed by either Accenture . . . or Deloitte . . . , neither of wh[ich] is an NDC."  (ECF 44 at 28-29.)  The remaining [* * *]percent of the work, Telesto asserts, is projected to be completed by [* * *] other subcontractors that Accenture identifies as NDCs.  (*Id.* at 28.)  According to Telesto's own calculations, which are not facially supported by the record, no NDC will complete more than [* * *] percent of the total work.  (*Id.*)  Given these "small amounts of marginal labor," Telesto argues that the Army's step-7 invitation to Accenture does not satisfy the requirement imposed by the NDC statute.

No case has yet interpreted what it means for an NDC to participate "to a significant extent" in a prototype project.  The plaintiff advances a simple quantitative approach based on each NDC's percentage of the prototype project's total projected labor hours to determine "significant" participation by NDCs in an OT.  The DoD OT Guide, which is cited in and followed by the PPON, provides its own definition of what constitutes "significant" NDC participation.  The DoD OT Guide offers a more flexible and nuanced means of calculating "significant" participation than Telesto advances.  The DoD OT Guide explains that Defense Department components are "expected to consider input from relevant technical advisors (legal, engineering, program management, pricing, logistics, etc.) in assessing the totality of the circumstances for each proposed prototype project before making an independent judgment as to the *significance* of expected NDC or nonprofit research institution participation."  DoD OT Guide 32 (version 1.0 2018) (emphasis in original).[11]

The PPON adopts the OT Guide's definition as to what constitutes participation by NDCs to a "significant extent" in the EBS-C program.  Proceeding from this definition, the PPON offers examples of what may constitute "significant contribution" by NDCs, including "supplying a novel application or approach to an existing technology, product or process; providing a material increase in the performance, efficiency, quality or versatility of a key technology, product or process; accomplishing a significant amount of the prototype project; cause a material reduction in the cost or schedule of the prototype project; or, providing for a material increase in performance of the prototype project."  (AR Tab 163 at 776.)  The narrow and single-factor definition of "significant" that Telesto advances is included within the PPON's examples (as "accomplishing a significant amount of the prototype project"), but the PPON

---

[11] Version 2.0 of the OT Guide was released in July 2023.  The PPON relies on the 2018 version, but the 2023 definition of "significant extent" is the same.  *See* DoD OT Guide 32 (version 2.0 2023).

recognizes a multitude of other means through which NDCs could "significantly" contribute to the project.

In addition to the list of the types of significant contributions provided in the PPON, the Affirmation of Business Status Certification that participants in the OT submitted at step 6 established a formal, seven-factor framework against which participants had to certify the NDC status of their subcontractors and contributors.  (AR Tab 459 at 7496-97.)

Accenture identified itself as a traditional defense contractor that would engage the significant participation of NDCs.  (*Id.*)  In a section of the form that requested the lead participant to explain how it met the NDC statute, Accenture provided a thorough explanation as to how numerous NDCs made a variety of contributions to each of the seven factors in the Army's framework.  (*Id.* at 7497.)  Each of the NDCs identified by Accenture certified to Accenture its NDC status.  (*Id.* at 7498-7522.)  The certification form used by the NDCs provided Accenture and the Army with detailed information about participants' ability to satisfy the NDC statute.  The Army was entitled to rely on these certifications.  *See Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1405-06 (Fed. Cir. 2021) ("a contracting officer is generally entitled to rely on a contractor's certifications"); *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1315 (Fed. Cir. 2016) (cleaned up) (emphasis original) (a contracting officer may rely on a contractor's certifications that it meets the requirements of a project unless "a proposal, *on its face*, should lead an agency to the conclusion that an offeror could not and would not comply" with the requirement).  Accenture's thorough certifications of its compliance with the NDC statute, the Army's entitlement to rely on those certifications, and the PPON's expansive definition of "significant contribution" establish that the Army's step-7 invitation to Accenture complied with the NDC statute.

The Army did not rely only on the certifications provided by Accenture in its evaluation of Accenture's compliance with the NDC statute.  Throughout its evaluation of Accenture's submissions at various stages of the project, the Army acknowledged the significant contributions of Accenture's NDC partners.  For example, the Army listed software contributions from one NDC as a "benefit" when it evaluated Accenture's submissions at steps 2 and 4 (AR Tab 338 at 4486, Tab 405 at 6092).  The Army found the contributions significant enough to warrant repeated mention of that same NDC by name in its evaluation, even though, according to Telesto's calculation, that NDC contributed only [* * *] percent to the overall projected work budget on the prototype.  (*See* ECF 44 at 53.)  As to another participating NDC, the Army highlighted its "direct knowledge of the organizational structure and force management components necessary to develop EBS-C" as a benefit to Accenture's step-2 performance.  (AR Tab 338 at 4479.)  Although Telesto alleges that this second NDC contributed only [* * *] percent of the total work and [* * *] percent of the total cost of Accenture's proposal (*id.*), the Army found this second NDC's contribution significant enough to warrant mention as a benefit of Accenture's prototype.

The Army thoroughly considered the extent of NDC participation with Accenture throughout the project, and its application of the OT Guide's multi-factor standards for evaluating NDC participation complies with the NDC statute.  Accenture provided thorough information regarding its compliance with the statute, and the Army was entitled to rely on that

information.  The Army also conducted its own review and evaluation of the extent of NDC participation in Accenture's project and found the work of NDCs significant enough to warrant mention in the Army's evaluations of Accenture's work during several steps of the project. Telesto's argument that the selection of Accenture at step 7 fails to comply with the NDC statute is baseless.

### 2.    The Army's compliance with the terms of the PPON

Telesto has also alleged that the Army failed to comply with the terms of the PPON when it revised the evaluation criteria that the PPON had outlined for step 5.  Telesto argues that "the Army made last-minute changes to the requirements and evaluation criteria for [s]prints 4 and 5 of [s]tep 5 that favored Accenture and that were never explained or justified."  (ECF 44 at 35.) By "lowering the requirements of these critical data migration sprints," Telesto explains, "the Army made it possible to find that Accenture performed acceptably."  (*Id.*)

In response, the defendant and defendant-intervenor argue that by waiting until this protest to raise its concern about the step-5 changes, the plaintiff has violated the requirement of *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007), and therefore waived its ability to bring this claim.  It must therefore be dismissed.  *M.R. Pittman*, 68 F.4th at 1280.  Even if the claim is not waived, they argue that because the Army changed the requirements for both remaining participants, Telesto was not prejudiced by the revisions.

The court has jurisdiction to consider this challenge because the Army's compliance with the PPON relates to its obligation to comply with 10 U.S.C. § 4022(f).  Section 4022(f)(2) provides that the Army may award a follow-on production contract "to the participants in the transaction without the use of competitive procedures" if (A) "competitive procedures were used for the selection of parties for participation in the transaction" and (B) "the participants in the transaction successfully completed the prototype project."

In this case, the PPON set out the terms of the competitive procedures, and the court may review them to ensure compliance with the statute.  When the agency alters the terms of the competitive process during the OT, a court may review revisions and changes to ensure that they do not eliminate competitive procedures, and that the OT remains compliant with the applicable statutes and regulations.  The court's jurisdiction does not extend as far as reviewing whether an agency's evaluations of the participating prototypes was arbitrary and capricious.  If the agency complied with applicable statutes and regulations, the court's authority is at an end.

In the protest of a typical, FAR-governed procurement, a party "who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the objection subsequently in a bid protest."  *Blue & Gold Fleet,* 492 F.3d at 1313; *see also COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (extending *Blue & Gold*'s waiver rule to "all pre-award situations").  When a claim is dismissed pursuant to *Blue & Gold Fleet*, the dismissal is pursuant to RCFC 12(b)(6).  *M.R. Pittman*, 68 F.4th at 1280.

*Blue & Gold Fleet* is a bid protest decision and therefore is not strictly applicable to an OT protest. The question is whether it makes sense to apply a rule devised for protests of FAR procurements to protests of OTs. The principle that contractors must protest an agency's pre-award decision when it occurs, rather than "roll the dice and see if they receive an award" remains instructive here. *See Blue & Gold Fleet*, 492 F.3d at 1314. The purpose of the *Blue & Gold* waiver rule is "to reduce inefficiencies by requiring an objection to a solicitation be made prior to close of bidding." *M.R. Pittman*, 68 F.4th at 1280.

There is no FAR-based solicitation for this OT. This project was initiated by the PPON, which must comply with the OT statutes 10 U.S.C. §§ 4021 and 4022, and applicable regulations. The PPON serves a similar purpose to a solicitation in that it establishes the requirements that prototype participants must fulfill if they are to complete the prototype project successfully and be considered for any follow-on production contract. The underlying principle supporting the waiver rule established by *Blue & Gold Fleet* applies with equal force to this project. The waiver rule applies to protests governed by section 1491(b)(1); this protest is governed by that statute, which is the sole basis for protest jurisdiction in this court. True, in a FAR-based procurement, offerors know throughout the process that they can bring either a pre- or post-award protest that will fall within the court's jurisdiction. In this OT, however, at the time the Army made the alleged error, Telesto did not and could not know whether it could ever bring a judicial protest. That lack of definite knowledge cuts against Telesto. If a participant in an OT does not know that it will ever be able to obtain judicial review of its complaint, its only option is to bring that complaint to the agency at the time it arises to allow the agency to address the point. Therefore, if a plaintiff is to avail itself successfully of the court's limited jurisdiction under section 1491(b)(1) to consider a protest of an OT, it must also accept the pitfalls that accompany the exercise of that jurisdiction; the waiver rule is one of those pitfalls.

Telesto's failure to object to the Army's revision of the PPON's step-5 evaluation criteria terms when the Army revised those terms is akin to a plaintiff's failure to object to the terms of a solicitation until after an agency makes an award. In both cases, the protestor has failed to alert the agency to its complaint in a timely manner to allow the agency to correct the mistake. Instead, Telesto took its chances and passed up an opportunity to lodge a timely objection to see if it would receive the step-7 invitation. Only when it did not receive that invitation, did Telesto raise an objection challenging the alleged misstep in this judicial protest.

The question arises whether Telesto had an opportunity to protest the changes of the evaluation criteria to the Army. The PPON described the Army's requirements and evaluation criteria for step 5. (AR Tab 163 at 822.) The Army sent invitations—which put participants on notice that "the EBS-program is in a funding pause"—to Accenture and Telesto on March 4, 2024. (AR Tab 409 at 6141; Tab 410 at 6142.) The Army sent notice of the revisions to the step-5 evaluation criteria via email on March 12, 2024. (AR Tab 7 at 29; Tab 23 at 81.) The email advised Accenture and Telesto of the revisions and indicated that an updated PPON and PWS at least five days before the first step-5 submissions were due. (*Id.*) The Army sent the updated PPON and PWS on March 25, 2025. (AR Tab 7 at 26; Tab 23 at 79.)

After receiving the March 12 email advising participants of the updates to the PPON, a Telesto executive involved in the project replied to the Army on March 13 that "[w]e're here for

the mission, ma'am and looking forward to the updated [s]tep 5 scope.  It will be mutually beneficial to hold a [s]tep 5 kick-off/information exchange meeting with the EBS-C program office to clarify the understanding of the scope and to discuss the expectations."  (AR Tab 23 at 80.)  The Army replied that it was willing to meet but would focus first on updating the PPON.  (*Id.*)  The record reflects that the Army scheduled meetings with both Telesto and Accenture following the release of the revised PPON.  (AR Tab 7 at 26; Tab 23 at 79.)

Telesto had ample opportunity to object to the Army's revisions to the step-5 evaluation criteria but did not do so.  The emails show that Telesto had an open line of communication with the Army about the revisions.  Telesto's March 13 email shows not only that Telesto was in communication with the Army about the revisions, but also that it was amenable to them.  Any objection could and should have been relayed to the Army during those discussions, or at some other point during the step-5 process.  Telesto could not indicate that it was amenable to the revisions, and then, after failing to secure an award following several additional, discrete steps in the process, challenge the revisions as arbitrary and capricious or otherwise illegal.

Even if the waiver rule does not apply to a protest of an OT project, the plaintiff's challenge to the Army's step-5 revisions to the PPON cannot succeed.  Congress has established that prototype projects issued pursuant to the Army's OT authority are different from procurement contracts.  *See* 10 U.S.C. § 4021.  To serve their purpose as nimble tools for developing bespoke products to meet Defense Department needs, the terms of any OT-governing documents like the PPON must be subject to change.  The OT Guide reflects this intent, noting that "[m]odifications of ongoing OT projects are fairly common. . . . Where a project is developing a new prototype in a unique environment, the [g]overnment and the performer should understand that the project may yield outcomes that surprise participants."  DoD OT Guide 19 (version 1.0 2018).  The OT Guide further explains that "terms and conditions can evolve via modification as a project proceeds through multiple phases of differing degrees of technological maturity."  *Id.* at 17.

The evolution contemplated by the OT Guide is precisely what occurred at step 5 of the EBS-C program.  In its email notification to Accenture and Telesto, the Army explained that "[d]ue to funding constraints of the program, as referenced in . . . Upward Invite #3, the [g]overnment has had to alter its path forward."  (AR Tab 7 at 29; Tab 23 at 81.)

The court's review of the PPON is limited to considering whether the Army's changes to and compliance with the PPON maintained the competitive procedures required by 10 U.S.C. § 4022(f) for OT projects that contemplate follow-on production contracts.  Within that scope of review, the Army complied with the statute.  The changes applied to both Accenture and Telesto equally, they both received notice of the changes on March 12, 2025, and an updated PPON reflected those changes on March 25, 2025.  Even if those changes did, as the plaintiff alleges, "lower[ ] the bar on [s]prints 4 and 5," it lowered the bar for both parties.  (*See* ECF 44 at 37.)  It does not matter that one party may have "needed" the new requirements more than the other to succeed on sprints 4 and 5; both parties were subject to precisely the same requirements and evaluation criteria, and both parties received upward invitations to the next step of the prototype project.  There is no error in the Army's course of action.

Finally, Telesto's challenge to the Army's revisions to the step 5 evaluation criteria fails because Telesto cannot show that it suffered any prejudice. *See Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009) (a protestor cannot show prejudice when the agency's "deviation from the solicitation . . . equally permitted all offerors" to compete under the same requirements, thereby "harming none"); *G4S Secure Sols. (USA), Inc. v. United States*, 146 Fed. Cl. 265, 273 (2019) (protestor could not established it was prejudiced by a last-minute change to the time limit for an oral presentation that was communicated to both offerors); *Engineering Sols. and Prods., Inc. v. United States*, 2011 WL 1627019 at *2 (Fed. Cl. Apr. 7, 2011) ("[i]f any prejudice could be found, it would apply to all offerors equally and thus cannot form a basis for protest by plaintiff"). The changes maintained the competitive procedures required by 10 U.S.C. § 4022(f) and applied to all offerors equally. In the absence of a showing of prejudice, a protest cannot succeed. *Sys. Stud. & Simulation*, 22 F.4th at 997.

The court's jurisdiction over the plaintiff's challenge to the revision of the step-5 evaluation criteria extends only to the Army's compliance with the NDC statute and the PPON. As to both challenges, the protest is denied. Even if the court could consider the merits, the plaintiff waived its challenge. Finally, if the court reached the merits of the challenge, the plaintiff cannot show prejudice and cannot prevail.

### C.    Telesto's Remaining Claims

Telesto's remaining two claims rest on its contention that the Army conducted steps 4 and 7 of the EBS-C program in an arbitrary and capricious manner. The court lacks jurisdiction to review these allegations in the context of an OT because the allegations are not tied to an alleged violation of statute or regulation in connection with a procurement or proposed procurement. Even if the court had jurisdiction over these claims, they would fail.

### 1.    Challenge to Evaluation of Step 4

The plaintiff alleges that the Army "irrationally ignored that Accenture faked its step 4 demo[nstration] by failing to integrate its solution with the SAP core." (ECF 44 at 38.) Telesto identifies several moments in a video from Accenture's step-4 technology demonstration that should have indicated to the Army that Accenture's prototype did not support real-time integration. (*Id.* at 39-40.) These moments, the plaintiff argues, "show[ ] that the Army failed to conduct a rational process that could detect something critically important," like real-time integration. (*Id.* at 40-41.) Given the "importance to the EBS-C program of . . . real-time integration, the Army's failure to properly determine if Accenture could demonstrate such integration is, on its own, a basis for setting aside the award." (*Id.* at 39.)

Telesto asserts that its technical lead on the project "recalls informing the Army of Telesto's concerns about Accenture faking its demo and failing to integrate," but that "the record shows that the Army did nothing to investigate this" failure. (*Id.* at 41.) Moreover, Telesto alleges that "after the Army's [s]tep[-]7 decision, a former [Accenture subcontractor] employee informed Telesto Vice President of SAP Practice . . . that Accenture had faked its [s]tep 4 demo[nstration]" by failing to show real-time integration. (*Id.* at 41.)

In response, the defendant and defendant-intervenor argue that Telesto waived its step-4 claim by failing to raise the alleged faking of the demonstration at the time, even though "Telesto claims to have had information at the time of [s]tep 4 which caused Telesto to become 'suspicious' that [Accenture] 'faked' its [s]tep 4 demo[nstration]." (ECF 50 at 23.) They argue that Telesto's awareness of the alleged failure and its knowledge that Accenture was invited to proceed to step 5 mean that Telesto had the knowledge necessary to bring its claim prior to the step-7 award. (ECF 50 at 24.) They argue that under *Blue & Gold Fleet*, Telesto waived this argument.

Given the information Telesto acknowledges it had about Accenture's step-4 performance prior to the step-7 award, Telesto should have alerted the Army to the alleged failure at the time it learned of it, and not after the fact. As discussed above in section, the holding of *Blue & Gold Fleet* is not strictly applicable to protests of an OT, but the principle underlying the waiver requirement is equally applicable this protest. The time for Telesto to have challenged Accenture's invitation to step 5 has passed, and its challenge will not be considered.

Telesto argues that it received additional information about Accenture's faking of its step-4 performance from a former Accenture subcontractor only after the step-7 award, so its protest is timely and not waived. The additional information received by Telesto after step 7 only confirmed and bolstered the suspicions that Telesto acknowledges it already had after step 4. The additional information did not alert Telesto to a new claim related to step 4. As at step 5, Telesto had a real-time knowledge to support a grievance with the Army's conduct of the prototyping competition but waited until the results of that competition were known to bring a claim based on that grievance. This strategy is barred under the principle of *Blue & Gold Fleet*.

Even if the principle underlying *Blue & Gold Fleet*'s waiver rule does not apply to an OT protest, the plaintiff's step-4 claim is rejected. The PPON does not mention real-time integration as a criterion to be met at step 4, and the Army's evaluations of the participants' step-4 submissions make no reference to real-time integration. (*See* AR Tab 163 at 821 (PPON); Tab 405 at 6081-97 (Accenture evaluation); Tab 405 at 6120-39 (Telesto evaluation).) Whether Accenture "faked" real-time integration or not makes no difference, as the Army was not looking for it. The Army did not evaluate Accenture's step-4 demonstration for real-time integration because real-time integration was not part of the Army's evaluation criteria.

Telesto asserts that the Army willfully buried its head in the sand in the face of evidence that Accenture faked an important part of its demonstration. The evidence in the record, however, reflects that the Army did not evaluate *any* participants' demonstrations for real-time integration, because real-time integration was not a required component of the demonstration. It was not a requirement of the step-4 demonstration, and a participant's failure to execute and demonstrate real-time integration does not render arbitrary and capricious the Army's decision to allow that participant to advance to step 5.

If Telesto thought real-time integration was a critical aspect of step 4 and needed to be shown, then it needed to make that point before the Army conducted step 4 and evaluated the projects under the PPON's criteria that did not include real-time integration. Telesto is seeking

to create a strawman and use it to undermine the Army's evaluation, but its effort is unavailing. Telesto's challenge to the Army's step-4 evaluation fails.

### 2.    Challenge to Evaluation of Step 7

Finally, the plaintiff challenges the Army's decision to award the step-7 invitation to Accenture, arguing that it "lacks a rational, reasoned basis." (ECF 44 at 44.) Central to this argument is the plaintiff's interpretation of the Army's summary chart comparing Accenture's and Telesto's performances at steps 5 and 6.[12] The plaintiff argues that the Army failed to explain "why the higher Accenture rating at [s]print 3 ([human-centered design]) outweighed the higher Telesto rating at [s]print 5 (data migration)." (*Id.* at 45.) It argues that the Army's explanation that "'the impact of Accenture's excellent demonstration during [s]print 3 far exceeds the benefits of Telesto's [good] demonstration in [s]print 5'" is a "purely conclusory assertion that fails to reflect any technical or business judgment or rationale." (*Id.* (quoting AR Tab 486 at 8044.)) This is especially so because, according to Telesto, the "most critical factor" in this project is "ensuring 'data integrity.'" (*Id.* at 46.) Sprints 4 and 5, therefore, were more important than sprint 3, and the Army's evaluation of Telesto's performance on sprint 5 as "good" should have "carried more weight" than its evaluation of Accenture's performance on sprint 3 as "excellent." (*Id.*)

The defendants argue that the plaintiff's challenge to the Army's step-7 evaluation was irrational is based on issues connected with steps 4, 5, and 6. Because the plaintiff failed to bring its challenges to these steps before the final award decision, they argue, its challenge to step 7 is waived. (ECF 50 at 21-22; ECF 52 at 23.) In the alternative, the defendants argue that Telesto's step-7 challenge fails on the merits.

The court lacks jurisdiction to consider this challenge, as it does not claim a violation of statute or regulation. Rather, Telesto merely takes issue with the Army's technical evaluations. That is the type of claim that falls beyond the limited jurisdictional grant of the third prong of section 1491(b)(1). Assuming the court does have jurisdiction to consider the issue, however, the challenge is rejected.

First, Telesto did not waive its challenge to the Army's step-7 decision. Its argument is predicated on a claim that the Army irrationally evaluated the participants' step-5 performance based on the way the Army weighted the ratings assigned to each participant, rather than on the Army's assignment of those ratings in the first place. Telesto could not have known how that weighting would affect the conclusion until step 7. Further, there is no evidence in the record that Telesto knew what adjectival ratings the Army had assigned to Accenture's performance at the various steps of the process. While Telesto waived its right to challenge alleged infirmities in the step-5 requirements and evaluation criteria, it has brought a timely objection to the Army's use of those criteria in the step-7 award decision.

---

[12] This summary chart is reproduced above at page 7.

Even though the challenge is waived, however, it also fails on the merits. In a typical protest of a FAR procurement, judicial review of an agency's evaluation decisions is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). This deference is at its greatest when an agency's award decision is based on the best value to the agency, *Glenn Defense Marine (ASIA) PTE, Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013), or when a plaintiff challenges "the minutiae of the procurement process in such matters as technical ratings." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1989) (explaining that these decisions "involve the discretionary determinations of procurement officials" and are therefore not subject to "second guess[ing]" by a court).

This deference to an agency's technical expertise and judgment is even greater in a developmental or prototyping project, when the agency does not even fully know its needs or how to meet them, and the participants are working with the agency to devise and implement a workable solution. *See, e.g., Blue Origin*, 157 Fed. Cl. at 106; *Kinemetrics*, 155 Fed. Cl. at 787-88; *Squire Sols., Inc. v. United States*, 156 Fed. Cl. 249, 267-68 (2021). Telesto cannot overcome the deference due to the Army's technical judgment, which is thoroughly explained and hews to the criteria outlined in the PPON.

The Army's step-7 decision document demonstrates that the Army considered the factors listed in the PPON. The amendment to the PPON published going into step 6 outlined the Army's intended basis for the step-7 award. (AR Tab 226 at 1385.) In it, the Army explained that the invitation to step 7 would be a "best value decision based on": (a) the step-5 evaluations of sprints 3, 4, and 5; (b) the step-6 evaluation; (c) price; and (d) terms and conditions. (*Id.*)

The step-7 decision document reflects precisely these factors. After outlining each participant's performance in each of the four specified factors (AR Tab 486 at 8038-40 (Accenture), 8040-42 (Telesto)), the Army compared the results. As to the step-5 evaluations of sprints 3, 4, and 5, the Army explained that Accenture's performance on sprint 3 "far surpassed Telesto's" because "Accenture [* * *]." (*Id.* at 8043.) The Army also explained that "Telesto surpassed the requirements in its [s]print[-]5 demonstration by [* * *]." (*Id.* at 8044.)

The Army ultimately decided that "the impact of Accenture's excellent demonstration during [s]print 3 far exceeds the benefits of Telesto's demonstration in [s]print 5." (*Id.* at 8043-44.) This statement is short, but it provides all that is needed. The Army explained why Accenture's sprint-3 performance was rated "excellent," and its decision to find this performance weightier than Telesto's "good" on sprint 5 comports with the adjectival system established in the decision criteria. (*See id.* at 8038.) "Excellent" is better than "good." Although Telesto attempts to get the court to substitute its judgment for the Army's as to which sprint is most important to the EBS-C program, the PPON's evaluation criteria reflect that participants' performance on sprints 3, 4, and 5 was given equal weight in the final evaluation. With Accenture's "excellent" and Telesto's "good" being the only distinguishing ratings between the two participants' sprint performances, the Army acted rationally in determining that Accenture outperformed Telesto at step 5.

As to the participants' step-6 performances, the Army again supported its position that Accenture's proposal was a better value. It explained that, although both proposals earned

ratings of "acceptable," the internal benefits of each proposal differed. Accenture's approach allowed the Army to "reprioritize metrics throughout performance," while Telesto's benefits were "limited" to the Continuous Exploration [Technical Integration Provider] Tasks section. (*Id.* at 8044.) This explanation reflects that the Army considered not only each participant's adjectival rating on step 6, but also the substance of each proposal to determine which benefits it found most beneficial and preferable. There is nothing irrational about the conclusion as explained in the record, and it is consistent with the criteria outlined in the PPON.

On total price, the Army explained its preference for Accenture's prototype. The Army noted that Telesto's price was [* * *] percent higher than Accenture's, even though Telesto had also proposed [* * *] percent fewer total labor hours than Accenture. The Army concluded that Telesto's labor hours "seem[ed] far too low, and that the disparity left the Army "unsure how Telesto would execute their [p]roduction solution and provide adequate support with the number of labor hours proposed." (*Id.*) The Army acted rationally in deciding that Accenture's lower price with more labor hours was preferable to Telesto's higher price with fewer labor hours.

Overall, the Army concluded that "based on the evaluations at [s]teps 5 and 6, and the fact that Accenture's price is . . . [* * *] lower than Telesto's, Accenture's solution Telesto represents the best value" to the Army. (*Id.* at 8045.) This statement accurately summarizes the findings in the detailed evaluations the Army provided of each participant's performance in the substance of the decision document. The Army followed the exact evaluation criteria that it established in the PPON, and its explanations provided in the decision document reflect a logical path toward the ultimate award of the step-7 invitation to Accenture. The Army acted rationally, and the plaintiff's challenge to the award decision fails.

## VI.    CONCLUSION

The court has limited jurisdiction to consider protests of OT-authority projects conducted under 10 U.S.C. § 4022.  The scope of that jurisdiction is limited to allegations that the agency violated a statute or regulation in connection with a procurement or proposed procurement or failed to comply with provisions of the document establishing the OT required by statute or regulation.  Telesto's allegations that fall within this jurisdictional scope fail.  The Army complied with the NDC statute, 10 U.S.C. § 4022(d)(1)(A), and with the terms of the PPON to ensure compliance with 10 U.S.C. § 4022(f).

As to these claims, the defendant's and defendant-intervenor's motions for judgment on the administrative record are granted.  As to Telesto's other claims, the defendant's and defendant-intervenor's motions to dismiss are granted.  Telesto motion for judgment on the administrative record is denied in its entirety.

In the alternative, if the court has jurisdiction to consider all Telesto's allegations, Telesto's motion for judgment on the administrative record is denied, and the motions of the defendant and defendant-intervenor for judgment on the administrative record are granted.

A separate order filed concurrently with this opinion directs the entry of judgment for the defendants.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

34